

*amended summons issued (pa)*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

————————————————————————

ROBERT R. RUHLMANN,

               Plaintiff,

       -against-

ULSTER COUNTY DEPARTMENT OF SOCIAL SERVICES,
ULSTER COUNTY DEPARTMENT OF MENTAL HEALTH,
MARSHALL BECKMAN, ERNEST TOWNSEND, BENEDIC-
TINE HOSPITAL, RUTH MCGREGOR, DR. JOEL GINS-
BERG, DR. KEVIN SMITH, DR. DIANA PUGLISI,
AND DR. DAVID STERES,

               Defendants.

————————————————————————

FIRST AMENDED
COMPLAINT

Civil Action No.
99-CV-0213
(~~FJS/DNH~~)
DNH/RWS

## PLAINTIFF REQUESTS TRIAL BY JURY

    ROBERT R. RUHLMANN, by his attorneys, Chamberlain and Kaufman,
for his complaint, states as follows:

### JURISDICTION AND VENUE

    1.   Plaintiff brings this action for damages and other relief
for illegal discrimination under the Americans with Disabilities
Act, 42 USC §12101 et seq., and New York State Executive Law § 296,
for unconstitutional false arrest and deprivation of liberty
without due process under 42 U.S.C. § 1983 and for false arrest and
negligence under New York State common law.

    2.   Jurisdiction of this action is conferred upon this Court
by 42 USC §2000e-5(f)(1) and (3), 42 USC §12117, 28 USC §§ 1331,
1343 and 1367.

3.    Venue of this action is established in this Court by 28 U.S.C. § 1391(b).

## PARTIES

4.    Plaintiff, Robert R. Ruhlmann, is a resident of the City of Kingston, Ulster County, State of New York.

5.    Defendant Ulster County Department of Social Services is a governmental entity in the State of New York, located in Kingston, New York.

6.    Defendant Ulster County Department of Mental Health is a governmental entity in the State of New York, located in Kingston, New York.

7.    At all times mentioned herein, defendant Marshall Beckman was Deputy Director of Ulster County Department of Mental Health. At all times mentioned herein, Mr. Beckman was acting under color of state law.   Mr. Beckman is sued both in his individual and official capacities.

8.    At all times mentioned herein, defendant Ernest Townsend was employed by Ulster County Department of Mental Health.  At all times mentioned herein, Mr. Townsend was acting under color of

state law.   Mr. Townsend is sued both in his individual and official capacities.

9.   Benedictine Hospital ("the Hospital") is located in Kingston, New York.   At all times mentioned herein, the Hospital was acting under color of state law.

10.   At all times mentioned herein, defendant Ruth McGregor was employed by or at Benedictine Hospital.   At all times mentioned herein, Ms. McGregor was acting under color of state law.   Ms. McGregor is sued both in her individual and state actor capacities.

11.   At all times mentioned herein, defendant Dr. Joel Ginsberg was employed by or at Benedictine Hospital.   At all times mentioned herein, Dr. Ginsberg was acting under color of state law. Dr. Ginsberg is sued both in his individual and state actor capacities.

12.   At all times mentioned herein, Dr. Kevin Smith was employed by or at Benedictine Hospital as Medical Director of Mental Health Services.   At all times mentioned herein, Dr. Smith was acting under color of state law.   Dr. Smith is sued both in his individual and state actor capacities.

13.   At all times mentioned herein, Dr. Diana Puglisi was employed by or at Benedictine Hospital.   At all times mentioned

herein, Dr. Puglisi was acting under color of state law.   Dr. Puglisi is sued both in her individual and state actor capacities.

13A.   At all times mentioned herein, Dr. David Steres was employed by or at Benedictine Hospital in the Emergency Room.   At all times mentioned herein, Dr. Steres was acting under color of state law.   Dr. Steres is sued both in his individual and state actor capacities.

14.   At all times mentioned herein, defendants McGregor, Smith, Ginsberg, Puglisi and Steres were acting as the employees and agents of the Hospital, and the Hospital is responsible for the actions of its employees and agents.

### FACTS

15.   Plaintiff was employed as a Social Welfare Examiner in the Medical Audit Department, Disability Review Unit of the Ulster County Department of Social Services in Kingston, New York starting in approximately November, 1995.   Plaintiff's job was to interview and monitor clients who applied for or were receiving Temporary Assistance and claimed that they were unable to work because of a physical, psychiatric, or drug/alcohol disability.

16.   Since the Spring of 1997, plaintiff had been treated medically for depression.   Plaintiff's condition did not affect his

ability to perform his job and his supervisors were not aware of his condition or his treatment.

17.  At or about January, 1998, plaintiff's condition changed.

18.  On or about February 10, 1998, plaintiff's treating psychiatrist told plaintiff that plaintiff had bipolar mood disorder.   To treat plaintiff's new condition, plaintiff's psychiatrist changed plaintiff's medication.   Plaintiff took a leave from work while he adjusted to the new medications.

19.  Plaintiff's direct supervisor was Marianne Razey and Ms. Razey's supervisor was Linda Sharpe, head of the MIS Fiscal Department.

20.  During this time period, in February, 1998, plaintiff went to speak with Linda Sharpe about an office-related matter.  At that meeting, plaintiff told Ms. Sharpe that he had a psychiatric diagnosis and was taking medication to treat it.

21.  Ms. Sharpe told plaintiff that if he had a psychiatric diagnosis and was taking medication, he was dangerous and should not be working there.

22.  Plaintiff told Ms. Sharpe that that was an ignorant thing to say and that many other people in the department would be

6

disqualified for employment under such a policy.

23.  After his conversation with Ms. Sharpe, when plaintiff
entered Department of Social Services grounds to hand in a
requested doctor's note, he was met by an Ulster County Deputy
Sheriff, who told plaintiff that he was not allowed on the premises
while on leave, and that plaintiff would have to go the Sheriff's
desk and the deputies would get whatever plaintiff needed.

24.  Plaintiff had never been treated this way previously.
Upon information and belief, no other employee of the County was
treated this way.

25.  Upon plaintiff's return to work in March, 1998, plaintiff
was subjected to differential treatment by his supervisors.  For
example, Ms. Razey told plaintiff that she had numerous complaints
about his work, that plaintiff was not to speak in the office, and
that plaintiff was not to go to the Temporary Assistance Office.
Others working in the office were not subject to these
restrictions.

26.  Plaintiff was also told by the Deputy Commissioner of the
Department of Social Services that a complaint had been received
about a visit plaintiff had made to the Ulster County Office of
Mental Health to speak with a friend on one of plaintiff's days out
of work.  She accused plaintiff of having used his status as an

employee of the Department of Social Services to gain access to the Office.  This accusation was not true.

27.    On  information  and  belief,  defendant  Ulster  County Department  of  Social  Services,  motivated  by  an  illegal  and irrational fear of plaintiff's mental illness diagnosis, formulated a  plan  to  remove  plaintiff  from  the  workplace  and  terminate  his employment  in  violation  of  his  federal  statutory  and  constitutional rights.

28.    On  information  and  belief,  in  furtherance  of  the  plan  to terminate  plaintiff  and  remove  him  from  the  workplace,  employees  of the  Department  of  Social  Services  contacted  the  Ulster  County Department  of  Mental  Health  to  have  plaintiff  arrested  and  confined in  Benedictine  Hospital.

29.    On  Thursday,  March  26,  defendant  Ernest  Townsend  of  the Ulster  County  Department  of  Mental  Health  contacted  defendant  Ruth McGregor  in  her  capacity  as  the  designee  of  the  Ulster  County Director  of  Community  Services,  and  requested  that  plaintiff  be arrested  and  involuntarily  brought  to  the  psychiatric  unit  at Benedictine  Hospital  pursuant  to  section  9.45  of  the  New  York  State Mental  Hygiene  Law.

30.    According  to  Hospital  records,  before  any  proper determination  of  the  propriety  of  such  arrest  of  plaintiff  was

made, Townsend told McGregor that he was contacting the chief of
the Kingston Police to have plaintiff picked up.

31.   McGregor had no previous contact with plaintiff.
Upon information and belief, McGregor is not a physician.

32.   At approximately 4:45 P.M. on March 26, 1998, McGregor
filled out and signed a preprinted form for admission of plaintiff
pursuant to section 9.45 of the Mental Hygiene Law.  By checking a
box on the form, McGregor asserted that Ernest Townsend was "a
licensed psychologist or certified social worker currently
responsible for providing treatment services to the person" who had
reported to McGregor that plaintiff had a mental illness for which
immediate care and treatment in a hospital was appropriate and
which was likely to result in serious harm to himself or others.

33.   By filling in other blanks on the form, McGregor directed
that police officers from Kingston Police Department pick-up
plaintiff and transport him to Benedictine Hospital.

34.   As of March 26, 1998, plaintiff had never met or spoken
with Ernest Townsend.

35.   As of March 26, 1998, Ernest Townsend was not a licensed
psychologist or a certified social worker currently responsible for
providing treatment services to plaintiff, nor had he ever been

responsible for providing such services.

36.   At the time Townsend called McGregor requesting plaintiff's arrest under the Mental Hygiene Law, Townsend knew or should have known that a request from him was not sufficient in fact or law to arrest plaintiff under the Mental Hygiene Law.

37.   At the time she filled out the form for plaintiff's arrest pursuant to section 9.45 of the Mental Hygiene Law, McGregor knew or should have known that Townsend did not come within any of the categories of persons upon whose request a designee of the Director of Community Services could order a person arrested and involuntarily transported to a psychiatric hospital under section 9.45.

38.   Upon information and belief, McGregor acceded to the request of Townsend on behalf of the Ulster County Department of Mental Health to further the plan of the County defendants to confine plaintiff at the Hospital despite the absence of legal and factual grounds to do so.

39.   On Thursday, March 26, 1998, at approximately 5:15 P.M., plaintiff was at home after work.   He was cleaning his house dressed in "tee" shirt and jeans.   Two police officers of the Kingston City Police Department came to plaintiff's door and told him that there was a problem at Benedictine Hospital and that

plaintiff would have to come with them.

40.  Plaintiff told the police officers that he needed to get his wallet and keys, put on a shirt and lock up the house.  Under the guise of wanting to use the phone, the officers came into plaintiff's house and instead of allowing him to get a shirt, his wallet and keys and secure the house, they handcuffed plaintiff with his hands behind his back, immediately removed him from the house, and placed him in the back seat of a police car.

41.  The two officers transported plaintiff to the Emergency Room at Benedictine Hospital.  Plaintiff demanded to know what was going on, but the officers did not tell him.

42.  Plaintiff arrived at the Emergency Room at approximately 5:30 P.M.  At the Emergency Room, plaintiff stood up against a wall, trying to hide the handcuffs.  He was guarded by the police officers.  Eventually, plaintiff was uncuffed and guarded by three Hospital security staff.

43.  Plaintiff was requested to change into a medical gown and did so.  He was checked for contraband.  None was found.  His clothes were taken from him and secured at the nursing station.

44.  Hospital records reflect that at 5:55 P.M. McGregor began an "evaluation" of plaintiff.  At 6:00 P.M. McGregor filled out an

Emergency Mental Health Evaluation form on which she concluded that plaintiff had "poor" "impulse control" "per reports," had no overt delusions, hallucinations or preoccupying thoughts, but was "homicidal" "per reports," which plaintiff denied.

45.  McGregor wrote in Hospital records that plaintiff should be admitted to the secure unit of the psychiatric ward of the Hospital pursuant to section 9.39 of the Mental Hygiene Law "per consult with Dr. Smith."   Upon information and belief, the Dr. Smith referred to is defendant Dr. Kevin Smith.

46.  Plaintiff was not examined by Dr. Smith at any time prior to McGregor filling out this form (or at any time thereafter). Among the medical records maintained by the Hospital there are no clinical notes by Dr. Smith reflecting an examination of any kind performed by Dr. Smith.

47.  McGregor was not a physician or anyone authorized by law to involuntarily confine plaintiff to Benedictine Hospital.

48.  The form filled out by McGregor reflected that plaintiff had been picked up at the request of the Ulster County Department of Mental Health, which had been contacted by the Ulster County Department of Social Services reporting that plaintiff had made threats to kill administrators.  McGregor wrote in one place that "due to specificity of threats & potential dangerousness pt will be

admitted for further evaluation."   In another place, she wrote:
"Due to seriousness of threats and unknown hx and pts questionable
reliability will be admitted."

49.   Nowhere in the Hospital records is there any reflection
of any effort by McGregor or anyone else at the Hospital to verify
the accuracy of the allegation of threats allegedly made by
plaintiff prior to the determination by McGregor and/or Smith to
admit plaintiff pursuant to section 9.39 of the Mental Hygiene Law.

50.   The entries made by McGregor purportedly explaining the
reasons for plaintiff's confinement do not meet the standards for
involuntary confinement under section 9.39 of the Mental Hygiene
Law.

51.   At no place within the form filled out by McGregor did
she record a finding or determination that plaintiff had a mental
illness which was likely to result in serious harm to himself or
others as defined by section 9.39 of the Mental Hygiene Law.

52.   There appears to be an undated entry by Dr. Puglisi on
the first page of the form filled out by McGregor.   The entry is
not completely legible, but it appears that Dr. Puglisi wrote that
plaintiff was a "danger to others" and should be admitted for
"stabilization for manic episode."   Plaintiff was not seen by Dr.
Puglisi until the morning of March 27, 1998, after plaintiff's

arrest and confinement.

53.   Nowhere in Hospital records is there any reference as to what manic episode plaintiff allegedly needed stabilization for, or why treatment by plaintiff's treating psychiatrist was not sufficient for such purposes.

54.   Hospital nursing records reflect an entry at 6:15 P.M. on March 26, 1998, stating "report to Ellen on 2SMC," which is the secure psychiatric unit at the Hospital.

55.   A preprinted form for "Emergency Admission" under section 9.39 of the Mental Hygiene Law appears to have been signed by Dr. Joel Ginsberg and by Dr. David Steres.  Dr. Ginsberg is noted on other Hospital documents as the "admitting physician."  The form's signature line is dated March 26, 1998, 6:30 P.M., which is after the time that McGregor had made an entry that plaintiff was to be admitted under section 9.39, and after the time of the entry that plaintiff was to report to the secure psychiatric unit at the Hospital, and after the time plaintiff was arrested and confined. The form notes the time of arrival at the hospital as "7:30 P.M." on March 26, 1998.

56.   Immediately above the form's signature line is a preprinted statement stating:

> I have examined the above-named person prior
> to admission and find there is reasonable

> cause to believe that the person has a mental
> illness for which immediate observation care
> and treatment in a mental hospital is
> appropriate and which is likely to result in
> serious harm to himself or herself or others.

The only other writing on the first page of the form signed by Dr.

Ginsberg and Dr. Steres is in the section entitled "B.

Circumstances which led to the person being brought to the this

hospital," which states: "Pt w/ bipolar disorder threatening to

blow up his worksite."


57.   As far as plaintiff knows, he was never given any

examination by Dr. Ginsberg at any time during his stay at the

Hospital.  Plaintiff's hospital records contain no clinical notes

from Dr. Ginsberg reflecting a mental examination of plaintiff (or

any other examination), or justifying or explaining the finding

indicated on the form in any manner other than the contents of the

form itself.


57A.   Plaintiff was not given any mental examination by Dr.

Steres at any time during his admission or confinement to the

Hospital.  Plaintiff's hospital records contain no clinical notes

from Dr. Steres reflecting a mental examination of plaintiff, or

justifying or explaining the finding on the form in any manner

other than the contents of the form itself.


58.   An "Emergency Department MD/PA/RNP Assessment Sheet"

reflects that plaintiff was medically examined for 10 minutes

between 7:15 and 7:25 on March 26, by a person whose signature is
illegible.  The form reflects that plaintiff was medically stable
and that laboratory tests were pending.  The form contains a box
that states "Admit, Dr. Smith."  No clinical notes from Dr. Smith
concerning plaintiff's mental condition or the satisfaction of the
criteria for involuntary admission under section 9.39 of the Mental
Hygiene Law are contained in the hospital records.

59.   The "Interdisciplinary Progress Note for the Mental
Health Unit" reflects that plaintiff was transferred from the
Emergency Room to "2SMC" at 7:30 P.M. on March 26.

60.  Plaintiff was interviewed by a "team," including Dr.
Puglisi, on the morning of March 27, 1998.  At that interview,
plaintiff denied making any threats to kill anyone, and noted that
people at work had been giving him difficulty because of his mental
illness diagnosis.  Plaintiff was given no tests at this interview.

61.  As a result of that interview, Dr. Puglisi noted that
plaintiff "may have been hypomanic," but that there was "no
evidence of any threatening behavior towards self/others."  The
plan was to "stable for outpt."

62.  Stabilization for outpatient treatment is not a basis
under the law for involuntary confinement of plaintiff.

16

63.   Plaintiff was told at that meeting that he would be released in time to keep the appointment he had with his treating psychiatrist scheduled for that afternoon.

64.   Notwithstanding the conclusion by Dr. Puglisi and the statement made to plaintiff in the morning of March 27, 1998, in the afternoon of March 27, 1998, plaintiff was advised that Marshall Beckman had requested the Hospital not to let plaintiff out of the Hospital and that plaintiff would not be allowed out of the Hospital at least until Monday.  Plaintiff was advised that it was "a political thing."

65.   On March 27, 1998, at 3:30 P.M.  Dr. Puglisi filled in the reverse side of the section 9.39 admission form signed on behalf of Dr. Ginsberg, which side was to be filled out to "confirm need for extension of emergency admission beyond 48 hours."  She checked a box that stated that plaintiff showed a "tendency to cause serious harm to others" based on plaintiff having "threatened to bomb DSS and kill personnel."  Her signature on the form allegedly her agreement with the pre-printed conclusion that there was "reasonable cause to believe that the patient has a mental illness for which immediate care and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or herself or others."

66.   Neither the form nor any clinical notes provide

explanation or support for these alleged conclusions of Dr. Puglisi or what had caused her to change her opinion since the morning, when she had reached and recorded the opposite conclusion.

67.  On March 27, 1998, Dr. Puglisi dictated a "history and physical examination," which was typed on March 28, 1998.  The document states "HOSPITAL REGULATION: All positive & important findings shall be recorded."

68.  The text of the document contains at least two significant factual errors.  It inaccurately recites that plaintiff had recently returned from "six months" leave after a manic episode.  The record also inaccurately recites that plaintiff had "been treated at Ulster County Mental Health and at Poughkeepsie for bipolar disorder."  Plaintiff had never been treated at Ulster County Mental Health or by anyone employed there.

69.  Under the section entitled "impression," Dr. Puglisi made no finding that plaintiff required immediate care and treatment for his mental illness, nor did she make a finding that plaintiff presented a substantial risk of physical harm to others.  Dr. Puglisi did not discuss the likelihood of such conduct or the need to make such a finding in order to continue to confine plaintiff against his will.  Rather, Dr. Puglisi stated as follows: "The plan is to observe him on SMC and obtain collateral interviews to explore further the veracity of the accusations of such threats,

since the DSS did request the Mental Health Commissioner to be warned if the patient is discharged since they are in fear of his acting out."

70.  Dr. Puglisi retained plaintiff because of the request of Beckman to keep him in the Hospital and not because of any independent professional opinion based on competent examination that plaintiff met the standards for involuntary confinement set forth in the Mental Hygiene Law.  In fact, Dr. Puglisi recorded her professional opinion that there was no basis to confine plaintiff under the Mental Hygiene Law in the secure unit of Benedictine Hospital.

71.  Plaintiff was confined in the secure Mental Health Unit for Saturday, March 28 and Sunday, March 29, 1998, without incident.

72.  At no time during his involuntary confinement in the Hospital was plaintiff ever advised of the names of any person who had made the claims that plaintiff had threatened to commit violent acts.

73.  On Monday, March 30, 1998, Dr. Puglisi entered in Hospital records that social services contacted Ulster County Department of Social Services and Marshall Beckman of Ulster County Department of Mental Health and advised them plaintiff would be

discharged and "there is no indication of any psychosis at this point." Further the following impression was recorded: "if pt, indeed made statements of terrorism (bomb/kill) it is a legal matter & the above individuals have been advised of his d/c, since we still have no clear identification of individuals who may have heard these statements first hand."

74. On Monday, March 30, 1998, in the afternoon, plaintiff was discharged from the Hospital.

75. To plaintiff's knowledge, at no time during his stay in the Hospital were any psychological tests administered to plaintiff.

76. Plaintiff was not served at the time of his admission or at any time during his confinement with written notice of his status and rights as a patient under section 9.39 of the New York State Mental Hygiene Law, nor was plaintiff requested to designate in writing the names of persons, not exceeding three in number, to receive such notice as required by the statute. Hospital records produced to plaintiff do not contain a copy of the required notice.

77. At not time did the Hospital give notice of plaintiff's status and rights under section 9.39 of the Mental Hygiene Law to the mental hygiene legal service as required by section 9.39.

78.    Plaintiff was charged with the expense of his confinement, some of which was paid by his medical insurance carrier.

79.    On April 27, 1998, approximately one month after plaintiff's discharge from the Hospital, Dr. Puglisi dictated a discharge summary for plaintiff.  The summary noted that plaintiff "requested discharge and on 03/30/98, after team contact with the mental health office as well as information from the patient's employer, it was felt that he was of no eminent [sic] danger to self or others due to psychiatric condition."

80.    Between Friday, March 27, 1998, and Monday, March 30, 1998, there was no change in the information available to Dr. Puglisi with respect to plaintiff meeting the standards for involuntary confinement pursuant to the Mental Hygiene Law.

81.    There was no basis in fact or law for the involuntary confinement of plaintiff at the Hospital at any time during his confinement.  Plaintiff was aware of his confinement at all times, and at no time did plaintiff consent to his confinement at the Hospital.

82.    Other than the conclusory statements "checked off" on preprinted forms, or conclusory statements with no detail written by McGregor and Dr. Puglisi, at no time either before or during

plaintiff's involuntary confinement at the Hospital did any person authorized to make such findings after examination of plaintiff make proper, competent findings required under the New York State Mental Hygiene Law for the involuntary confinement of plaintiff.

83.   The conduct of defendants Smith, Steres, Ginsberg and Puglisi in authorizing the involuntary confinement of plaintiff under section 9.39 of the Mental Hygiene Law did not conform to the requirements of that section of the law.

84.   The conduct of defendants Smith, Steres, Ginsberg and Puglisi in authorizing the involuntary confinement of plaintiff under section 9.39 of the Mental Hygiene Law did not conform to the standards generally accepted in the medical community for the examination of patients and for diagnosing and determining the need for involuntary confinement in secure psychiatric hospitals.

85.   Dr. Ginsberg, Dr. Steres and Dr. Smith conducted no mental examination at all of plaintiff.   Dr. Puglisi's "examination" consisted of a brief interview of plaintiff with other members of the treatment team, after which she concluded that plaintiff did **not** meet the standards for involuntary confinement under section 9.39 of the Mental Hygiene Law.

86.   Defendants McGregor, Steres Ginsberg, Smith, and Puglisi knew or should have known that the factual and legal prerequisites

for the confinement of plaintiff were not present.

87.   Defendants McGregor, Steres, Ginsberg, Smith and Puglisi knew or should have known that their actions in certifying on various papers that certain factual and legal prerequisites required by the Mental Hygiene Law, and the New York State and federal constitutions, were met, when in fact they were not met, and when in fact no actions or insufficient actions were taken to determine whether the factual and legal prerequisites were met, would result in the involuntary confinement of plaintiff in the secure unit of the Hospital.

88.   The Hospital and its employees and agents, McGregor, Steres, Ginsberg, Smith, and Puglisi, authorized the arrest and involuntary confinement of plaintiff not because the statutory and constitutional prerequisites for such arrest and confinement were met, but because the County employees and agencies requested that plaintiff be arrested and held in the Hospital.

89.   The Hospital with, by and through, its employees and agents, McGregor, Steres, Ginsberg, Smith, and Puglisi, were willful and knowing participants in joint activities with defendants Ulster County Department of Social Services, Ulster County Department of Mental Health, Beckman and Townsend, and possibly others as yet unidentified, to confine plaintiff against his will in violation of plaintiff's federal and state law rights.

90.   On the day of his discharge, plaintiff called the secretary to the Ulster County Commissioner of Social Services and asked when he could return to work.   She was unable to tell him.

91.   About 5:00 P.M. on that date, two Ulster County Sheriff's Deputies delivered a letter to plaintiff from Glenn Decker, Ulster County Commissioner of Social Services, placing plaintiff on a leave of absence with pay pursuant to Civil Service Law section 72(5) on the grounds that plaintiff had "made threats to use deadly physical force against other employees of this department."

92.   On April 6, plaintiff sent a registered letter to Mr. Decker stating that he did not recall making any such threats and asking for the specifics of the threats.   Plaintiff never received a response to this letter.

93.   On or about May 14, 1998, plaintiff received from his union a copy of a letter dated April 27, 1998, signed by Dolores Miller, Deputy Commissioner of the Department of Social Services, charging plaintiff with a "pattern of behavior designed to intimidate and threaten your co-workers and supervisors."

94.   The letter provided that plaintiff had until May 8, 1998, to make and file his response to the charges.

95.   Plaintiff wrote a letter to Delores Miller requesting an extension of time to respond, but never received a response.

96.   Plaintiff felt compelled by the stress created by all the recent circumstances -- including the harassment and discrimination at work, the unjustified and illegal arrest and removal of plaintiff from his home at the request of his employer, the involuntary and illegal confinement for four days in the secure unit of Benedictine Hospital, the service by two police officers on the day of his release from his illegal confinement of a notice to stay away from work, and the unjustified disciplinary charges, all motivated by illegal discrimination against plaintiff based on his mental illness diagnosis -- to put an end to the stress of having to deal with the County on an ongoing basis, particularly the County's efforts to fire plaintiff due to his mental illness diagnosis.   On or about May 19, 1998, plaintiff resigned his position with the Ulster County Department of Social Services.

97.   Subsequent to his release from the Hospital, plaintiff requested a copy of his medical records from the Hospital.   After approximately six weeks, the Hospital provided plaintiff with records that appeared to be partial records only.

98.   Subsequent to the receipt of these records, on June 24, 1998, plaintiff's attorney wrote to the Hospital requesting confirmation that the records were all the records that existed and

requesting that the Hospital inform plaintiff's attorney under what section of the law plaintiff was confined in the Hospital.

99.   The Hospital responded to the letter of plaintiff's attorney by letter dated July 1, 1998, from Gayle Donoghue, RN, whose title was stated as "Risk Manager Coordinator," informing him that plaintiff had been confined pursuant to Mental Hygiene Law section 9.39, and that only the part of plaintiff's records "that his physician authorized to be released" had been provided to plaintiff.

100.   In response to this letter, plaintiff's attorney wrote another letter to Ms. Donoghue, dated July 6, 1998, requesting a copy of the written notice of plaintiff's status and rights provided to plaintiff pursuant to section 9.39 of the Mental Hygiene Law and any proof of such notice to mental hygiene legal services and other persons designated by plaintiff to receive such notice.

101.   Plaintiff's attorney also requested to be provided with the authority relied on by the Hospital to deny plaintiff a complete copy of his records.   If the denial was claimed to be pursuant to section 33.16(c) of the Mental Hygiene Law, a request was made for the notification of the denial of the access to the records provided to plaintiff pursuant to the terms of that statute.

26

102.   In response to plaintiff's attorney's letter requesting such information, Ms. Donoghue sent plaintiff's attorney a letter dated August 4, 1998, which stated that she was enclosing a copy of plaintiff's "complete record" and that plaintiff's "treating physician has granted the release."

103.   The records provided to plaintiff's attorney did not contain a copy of written notice to plaintiff of his status and rights pursuant to section 9.39 of the Mental Hygiene Law, and no copy of any such notice has been provided to plaintiff or his attorney to date.

104.   On June 24, 1998, the County was served with notice of plaintiff's claim against it.

105. On or about December 22, 1998, plaintiff received a right to sue letter from the United States Department of Justice.  This action is commenced within 90 days of receipt of that letter.

106.   As a result of defendants' illegal actions plaintiff has suffered damages including but not limited to loss of employment, loss of income and benefits, mental and emotional suffering including fear, anxiety, depression, humiliation and embarrassment, damage to his reputation, and medical expenses.

**FIRST   CLAIM   FOR   RELIEF   (against   all defendants)**

107.  Defendants at all relevant times were acting under color of state law.

108.  The actions of defendants in causing the illegal arrest and confinement of plaintiff against his will in the secure psychiatric unit of Benedictine Hospital violated plaintiff's rights to be free from false arrest and deprivation of liberty without due process under the Fourth and Fourteenth Amendments of the United States Constitution.

109.  Defendants' actions in violating plaintiff's constitutional rights were done in a willful and reckless manner in wanton disregard for plaintiff's rights and plaintiff is entitled to recover punitive damages in addition to compensatory damages.

### SECOND CLAIM FOR RELIEF (against Ulster County Department of Social Services)

110.  At all times relevant to this case, plaintiff was a qualified individual with a disability within the meaning of the Americans with Disabilities Act, 42 USC § 12102(2).

111.  Defendant Ulster County Department of Social Services was an employer of plaintiff and covered by the Americans with Disabilities Act, 42 USC § 12111.

112.  The actions of defendant Ulster County Department of

Social Services in seeking to have plaintiff arrested and
involuntary confined, seeking to discipline and discharge plaintiff
and in causing plaintiff's constructive discharge, constitute
discrimination in violation of the Americans with Disabilities Act,
42 USC § 12112.

113.  The actions of defendant Ulster County Department of
Social Services in violating plaintiff's rights under the Americans
with Disabilities Act constitute gross, reckless and/or intentional
conduct in violation of plaintiff's rights under the Americans with
Disabilities Act entitling plaintiff to punitive damages in
addition to compensatory damages.

**THIRD   CLAIM   FOR   RELIEF   (against   all
defendants)**

114.  The actions of defendants in causing the illegal arrest
and confinement of plaintiff against his will in the secure
psychiatric unit of Benedictine Hospital violated plaintiff's
rights to be free from false imprisonment under New York law.

115.  Defendants' actions in violating plaintiff's rights to
be free from false imprisonment and illegal deprivation of liberty
were done in a willful and reckless manner in wanton disregard for
plaintiff's rights and plaintiff is entitled to recover punitive
damages in addition to compensatory damages.

**FOURTH    CLAIM    FOR    RELIEF    (against    all defendants)**

116.   The actions of defendants in causing the illegal arrest and confinement of plaintiff against his will in the secure psychiatric unit of Benedictine Hospital violated plaintiff's rights under Article I, Section 6 of the New York State Constitution to be free from the deprivation of his liberty without due process.

117.   Defendants' actions in violating plaintiff's rights to be free from false imprisonment and illegal deprivation of liberty were done in a willful and reckless manner in wanton disregard for plaintiff's rights and plaintiff is entitled to recover punitive damages in addition to compensatory damages.

**FIFTH CLAIM FOR RELIEF (against the Ulster County Department of Social Services)**

118.   Plaintiff has a disability within the meaning of section 296 of the New York State Executive Law.

119.   Defendant Ulster County Department of Social Services was an employer of plaintiff and covered by the anti-discrimination provisions of New York State Executive Law.

120.   The actions of defendant Ulster County Department of

Social Services in seeking to have plaintiff arrested and involuntary confined, seeking to discipline and discharge plaintiff and in causing plaintiff's constructive discharge, constitutes discrimination in violation of New York State Executive Law.

121.   The actions of defendant Ulster County Department of Social Services in violating plaintiff's rights under New York State Executive Law constitute gross, reckless and/or intentional conduct in violation of plaintiff's rights entitling plaintiff to punitive damages in addition to compensatory damages.

**SIXTH CLAIM FOR RELIEF (against defendants Hospital, McGregor, Steres, Ginsberg, Smith and Puglisi)**

122.   At all relevant times, in performing the acts set forth above, McGregor, Steres, Ginsberg, Smith and Puglisi were the agents, servants and employees of the Hospital, and were acting within the scope of employment and with the permission and consent of the Hospital.

123.   At all relevant times defendants, McGregor, Steres, Ginsberg, Smith, Puglisi and Hospital owed a duty of reasonable care to plaintiff to use that level of knowledge, skill and care that is generally used in similar cases and circumstances by physicians and designees of the Director of Community Services for determining arrest and involuntary confinement of persons pursuant

to the Mental Hygiene Law.

124.   In taking actions resulting in plaintiff's arrest and involuntary confinement in the Hospital, defendants McGregor, Steres, Ginsberg, Smith, Puglisi and Hospital breached the duty of reasonable care owed to plaintiff.

125.   As a direct and proximate result of the breach of the duty of reasonable care of defendants Hospital, McGregor, Steres, Ginsberg, Smith, and Puglisi, plaintiff suffered damages.

126.   The breach of duty owed to plaintiff was done in a manner constituting a gross and reckless disregard for defendants' obligations under law to apply a reasonable standard of care before taking actions resulting in the arrest and confinement of plaintiff.  The actions of defendants demonstrating such gross and reckless disregard include but are not limited to not verifying information to ascertain that the prerequisites of the law were complied with, not conducting any examinations or a proper examination, not documenting proper findings, not providing plaintiff with notice of his status and rights, arresting, confining and continuing to hold plaintiff at the request of the County defendants even when defendants knew that the proper examinations and findings had not been made.  As a result of defendants gross and reckless disregard for plaintiff's rights and the standard of care to be applied before a person is arrested and

32

involuntarily confined, plaintiff is entitled to punitive damages in addition to compensatory damages.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment against defendants for:

A.  Lost wages and benefits.

B.  Reinstatement to his position or appropriate front pay.

C.  Damages for medical bills and other economic loss.

D.  Compensatory damages for deprivation of his liberty, damage to reputation and mental and emotional suffering.

E.  Punitive damages.

F.  Attorney's fees and costs of this action.

G.  Such other and further relief as may be just and equitable.

Dated:  October 27, 1999

ALAN S. KAUFMAN, 103097
CHAMBERLAIN AND KAUFMAN
35 Fuller Road
Albany, New York 12205
(518) 435-9427 (Telephone)
(518) 435-9102 (Fax)